**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
RORY VITAGLIANO,                                   :
                                                   :     Civil Action No.:
                          Plaintiff,               :
           v.                                      :
                                                   :     **COMPLAINT**
JONATHAN ADLER ENTERPRISES, LLC, and               :
CHRIS BUCKNER, and LINET MARTIN in their           :
individual and professional capacities,            :     **Jury Trial Demanded**
                                                   :
                          Defendants.              :
                                                   :
----------------------------------------------------------------X

Plaintiff Rory Vitagliano ("Plaintiff" or "Mr. Vitagliano"), as and for his claims against

Defendants Jonathan Adler Enterprises, LLC ("Jonathan Adler" or the "Company"), Chris

Buckner and Linet Martin (together, the "Defendants") hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      Rory Vitagliano was a dedicated and high performing sales employees and

Assistant Store Manager at Jonathan Adler, the high-end home furnishings and designs store,

with a worldwide presence with store locations in New York, Florida, Texas, Illinois, California,

and the United Kingdom.

2.      Even as Jonathan Adler had to abruptly close its stores due to the COVID-19

pandemic in the early spring of 2020, Mr. Vitagliano continued to work tirelessly from home,

becoming one of the Company's most successful sales employees in the process.

3.      However, at the same time that he was successfully selling and marketing

Jonathan Adler's products, Mr. Vitagliano was suffering in silence as a victim of sexual

harassment at the hands of his immediate supervisor, Chris Buckner.

4.      Mr. Buckner, who, like Mr. Vitagliano, is a gay man, would unwantedly and inappropriately touch Mr. Vitagliano when the two were alone together in the Jonathan Adler store to which they were assigned, and would also make unwanted comments about Mr. Vitagliano's appearance and sex life.

5.      After enduring this sexual harassment for months, in May 2020, Mr. Vitagliano determined that he had to report Mr. Buckner's unlawful conduct and complained to Area Manager Linet Martin about the sexual harassment he had experienced.

6.      Incredibly, Ms. Martin's immediate reaction was to instruct Mr. Vitagliano to remove the term "sexual harassment" from his complaint.

7.      After a shoddy purported "investigation" was completed, Mr. Buckner was not disciplined in any way but, rather, it was Mr. Vitagliano who was shockingly retaliated against by being transferred to a lesser performing store, which meant that his compensation, which was partly commission-based, would decline.

8.      Nonetheless, Mr. Vitagliano put his head down and worked extremely hard to help turn around the struggling store to which he was retaliatorily assigned, becoming one of the highest performing sales employees in the Company worldwide.

9.      Ultimately, however, days after Mr. Vitagliano once again engaged in protected activity – this time he objected to not being timely paid his wages – the Company decided that it had had enough with Mr. Vitagliano, and abruptly terminated his employment in September 2020.

10.      Mr. Vitagliano had not received any performance criticisms or write-ups or warnings at the time of his termination, and had, in fact, been praised just weeks earlier by

Jonathan Adler's Chief Executive Officer ("CEO") Justin Sonfield about his strong performance and promotion prospects.

11.     The vague purported reasons given for his termination – that Mr. Vitagliano was not the "right fit" for the Company – is belied by reality and his strong, consistent performance, and screams of utter pretext for unlawful discrimination and retaliation.

12.     Indeed, Andrew Friedman, Mr. Vitagliano's manager at the time of his termination, later confirmed to Mr. Vitagliano that he himself was "totally blindsided" by the Company's decision to fire Mr. Vitagliano, and that he "had no reason" to want to terminate Mr. Vitagliano's, particularly because Mr. Vitagliano was a "f*cking money machine," in reference to his performance.

13.     As a result, Mr. Vitagliano brings forth this action to seek redress for the unlawful discrimination, retaliation, and other harms perpetrated against him, and so that other employees of Jonathan Adler do not fall victim to unlawful sexual harassment or are punished simply for speaking out against unlawful activities at the Company.

14.     Mr. Vitagliano hereby seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); the New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"); and the New York Labor Law ("NYLL") §§ 191 and 215.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action involves

federal questions under Title VII.

16.      The Court has supplemental jurisdiction over the claims brought under New York

state and New York City law pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the

events or omissions giving rise to this action, including the unlawful employment practices

alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

18.     Mr. Vitagliano filed a Charge of Discrimination with the Equal Employment

Opportunity Commission ("EEOC") in connection with Defendants' violations of Title VII.

This action is being filed within 90 days of Mr. Vitagliano's receipt of his Notice of Right to Sue

from the EEOC.

19.     Pursuant to NYCHRL § 8-502, Mr. Vitagliano will serve a copy of this Complaint

upon the New York City Commission on Human Rights and the New York City Law

Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying

the notice requirements of that section.

20.     Any and all other known prerequisites to the filing of this suit have been met.

## PARTIES

21.     Plaintiff Rory Vitagliano is an adult resident of Queens, New York, and at

relevant times, was an Assistant Store Manager at Jonathan Adler and an "employee" under the

relevant statutes.

22.     Defendant Jonathan Adler Enterprises, LLC is a domestic limited liability corporation incorporated in New York with its principal office in New York, New York. Jonathan Adler Enterprises was, at all relevant times, an "employer" under the relevant statutes.

23.     Defendant Chris Buckner was, at relevant times, a manager at Jonathan Adler and an "employer" under the relevant statutes.

24.     Defendant Linet Martin was, at relevant times, an Area Manager at Jonathan Adler and an "employer" under the relevant statutes.

## FACTUAL ALLEGATIONS

I.     **Mr. Vitagliano's Employment and Mr. Buckner's Sexual Harassment**

       A.     **Mr. Vitagliano's Strong and Successful Performance at Jonathan Adler**

25.     Mr. Vitagliano joined Jonathan Adler as an Assistant Store Manager, a sales-heavy position, at its flagship store located at 715 Lexington Avenue, New York, New York (the "Lexington Avenue store") on January 6, 2020.[1]

26.     Mr. Vitagliano had previously been recruited twice by the Company, first in May 2019, and again in November 2019.

27.     Mr. Vitagliano was enthusiastic about the Company's brand, and immediately distinguished himself as a high performer – eventually ranking as Jonathan Adler's third highest year-to-date revenue producer through September 2020, and its second-highest revenue earner company-wide for the month of August 2020.

28.     At no point during his employment at Jonathan Adler did Mr. Vitagliano have any attendance or disciplinary issues.

---

[1]     This store location was closed in mid-February 2020, and a new store was opened nearby at 135 E. 65th Street.  Both store locations will be referred to herein as the "Lexington Avenue store."

29.     Rather, Mr. Vitagliano was poised to swiftly move up through the Company's ranks.  In fact, in early September 2020, less than a month before his unlawful termination, Mr. Vitagliano met with Justin Sonfield, Jonathan Adler's Chief Executive Officer ("CEO"), who bestowed nothing but praise upon Mr. Vitagliano for his performance and dedication to the Company, and specifically indicated that he was well aware and supportive of Mr. Vitagliano's aspirations of being promoted within the Company.

30.     Similarly, Ms. Martin, Acting Area Manager, said to Mr. Vitagliano on multiple occasions, "**Rory, you're headstrong and that's exactly what we need.**"

31.     By all reasonable measures, Mr. Vitagliano quickly established himself as a model Jonathan Adler employee during his ultimately brief tenure at the Company.

**B.      Mr. Vitagliano Is Subjected to Unlawful Sexual Harassment at the Hands of His Manager, Chris Buckner**

32.     Unfortunately, within days of joining Jonathan Adler, Mr. Vitagliano immediately fell victim to unlawful sexual harassment at the hands of his immediate supervisor, Chris Buckner, the Store Manager of the Lexington Avenue store.

33.     This unlawful sexual harassment would continue for months.

34.     Specifically, on or about January 7, 2020, while Mr. Vitagliano and Mr. Buckner sat next to each other as they prepared to get onto a conference call, Mr. Buckner reached over and unwantedly pinched Mr. Vitagliano's inner leg and said, "[I'm] excited to work with [you]."

35.     Both Mr. Vitagliano and Mr. Buckner are gay, and the harassing behavior was blatantly sexual.

36.     Following this January 7, 2020 incident, Mr. Buckner continued to unwantedly touch and make inappropriate, suggestive comments towards Mr. Vitagliano virtually every chance he could get.

6

37.     For instance, on multiple occasions Mr. Buckner would come up behind Mr. Vitagliano and unwelcomely run his fingers through Mr. Vitagliano's hair.

38.     As a further example, Mr. Buckner repeatedly made inappropriate comments and remarks to Mr. Vitagliano, such as inquiring about Mr. Vitagliano's sex life, and frequently remarking about how Mr. Vitagliano's "ass ... look[ed] good" in certain pants Mr. Vitagliano wore.

39.     Workplace sexual harassment also often functions as a way for the supervisor/harasser to assert control over an employee. Mr. Buckner perpetually sought opportunities to control Mr. Vitagliano and the narrative of their work.

40.     For example, Mr. Buckner once suggested that he and Mr. Vitagliano select rugs from the store's inventory, systematically remove them from the list as "damaged goods," and effectively steal the items.  Mr. Vitagliano declined this invitation.

II.     **Jonathan Adler Fails to Redress Mr. Vitagliano's Sexual Harassment Complaints**

41.     When the COVID-19 pandemic hit New York and forced the City to effectively shut down in March 2020, Mr. Vitagliano, like virtually all Jonathan Adler employees, began working from home, and continued to excel and produce while doing so.

42.     While Jonathan Adler laid off many workers due to the economic effects of the pandemic, the Company specifically retained Mr. Vitagliano, which is a testament to his already stellar performance.

43.     When the lockdown restrictions began to ease, Mr. Vitagliano volunteered to start going into the store to prepare shipment orders and did so on three or four occasions.

44.     On one such occasion, on May 6, 2020, Mr. Vitagliano rented a car to travel to the Lexington Avenue store and picked up Mr. Buckner to accompany him there.

45.     From nearly the moment Mr. Buckner entered the vehicle, he began to bombard Mr. Vitagliano with unwanted, harassing questions about Mr. Vitagliano's sex life and the identity of any current sexual partners.

46.     These questions made Mr. Vitagliano extremely uncomfortable.

47.     Two days later, on May 8, 2020, Mr. Vitagliano submitted a written complaint detailing Mr. Buckner's sexual harassment to Ms. Martin, the Area Manager, and spoke to Ms. Martin on the phone later that day.

48.     A few days later, Ms. Martin stated that an "investigation" would purportedly be conducted.  Ms. Martin asked Mr. Vitagliano whether he wanted his name to be disclosed to Mr. Buckner during the course of the "investigation," to which Mr. Vitagliano agreed.

49.     Notably, Ms. Martin also instructed Mr. Vitagliano to remove the term "sexual harassment" from his complaint.

50.     The conduct Mr. Vitagliano described in his complaint went well beyond what was professional and acceptable.  Mr. Vitagliano's complaint should have immediately raised alarm bells requiring prompt Company involvement.

51.     However, Mr. Vitagliano received no follow-up to his very serious concerns, and when he inquired about the results of the alleged "investigation," he was told merely that Mr. Buckner had watched a sexual harassment training video, and that he had therefore "done everything he needed to do to maintain his employment with the company."

52.     Moreover, as one can imagine, Mr. Vitagliano was no longer comfortable working directly under Mr. Buckner's supervision, nor did he feel he could continue or should be required to keep working with him alone.

53.     To that end, Mr. Vitagliano began reporting to Ms. Martin.

54.    Ms. Martin also assured Mr. Vitagliano that he would never have to work alone with Mr. Buckner.

55.    However, once New York City entered Phase 2 of its COVID-19 reopening plan, the Company decided to reopen only its flagship Lexington Avenue store.

56.    Five employees, including Mr. Vitagliano and Mr. Buckner, were assigned to report to this store.  Mr. Vitagliano was concerned that he inevitably would have to work alone with Mr. Buckner, which prompted him to ask Ms. Martin, who handles employee scheduling, about Mr. Buckner's schedule, and what particular days Mr. Buckner would be scheduled to have off.

57.    Rather than cooperate with and allay the fears of an employee who had repeatedly fallen victim to sexual harassment at the hands of his manager, Ms. Martin became incredibly hostile towards Mr. Vitagliano and tersely responded, "It's none of [your] business."  It was clear not only that neither the Company nor Ms. Martin had any interest in protecting Mr. Vitagliano, but also that Mr. Vitagliano was being noticeably treated differently and worse since he engaged in protected activity.

58.    As Mr. Vitagliano feared, and despite the Company's purported action plan to address Mr. Vitagliano's serious safety concerns, Mr. Vitagliano and Mr. Buckner did indeed end up working alone together in the Lexington Avenue store.

59.    Of note, within weeks after Mr. Vitagliano started working at Jonathan Adler in January 2020, Ms. Martin stopped by the Lexington Avenue store, and during her visit, mentioned the fact that she herself had apparently been the subject of a "hostile work environment complaint."

60.     Ms. Martin did not go into specifics about the purported complaint, but did make it clear that she knew the identity of the employee who had made the complaint.  Ms. Martin further made it a point to say, "**We've done it before, and we'll do it again – if we don't like you, we'll just get rid of you**."

61.     Ms. Martin would later echo these words at a March 2020 assistant manager training session.  The implication from Ms. Martin's threatening remark was clear – the Company had previously fired employees who had made complaints and would not hesitate to do so again in the future.

62.     Through her ominous words, Ms. Martin issued a warning to Mr. Vitagliano and other Jonathan Adler employees to fall in line accordingly, or else you will be fired.

### III.    Defendants Retaliate Against Mr. Vitagliano for His Protected Sexual Harassment and Wage-Related Complaints by Terminating His Employment

63.     Jonathan Adler's flagship Lexington Avenue store, where Mr. Vitagliano was assigned, was far and above the Company's most profitable location.

64.     This meant that Mr. Vitagliano, whose compensation structure had a heavy commission component, had the potential to earn the most money by remaining at and working from the Lexington Avenue store.

65.     However, after the Company decided to re-open its Upper West Side ("UWS") store, it moved Mr. Vitagliano over to that store, while allowing Mr. Buckner to remain at the more profitable store, despite having sexually harassed Mr. Vitagliano.

66.     Even though it was he, and not Mr. Buckner, who was being punished as a result of Mr. Vitagliano's decision to report Mr. Buckner's sexual harassment, Mr. Vitagliano nevertheless rose to the occasion and proved himself once again to be a highly valuable contributor to the Company.

10

67.     Mr. Vitagliano helped turn around the UWS store, which had a history of performing below expectations.

68.     Mr. Vitagliano even took on more managerial responsibilities, which included actively coaching a struggling salesperson at that store.  Notably, even though this salesperson was underperforming and had to be heavily coached, the Company made the decision to continue to give this employee every possible opportunity to turn his performance around.

69.     Mr. Vitagliano also went the extra mile when it came to his interactions with and servicing of customers/clients.  For example, when one customer from Ohio sent him angry text messages about a lamp that had been delivered broken, and then called Mr. Vitagliano outraged, Mr. Vitagliano deftly defused the situation.

70.     Andrew Friedman, who was the Store Manager of the UWS store, would later confirm that Mr. Vitagliano handled this situation correctly, and that his communications with the client had been appropriate.

71.     Additionally, when one high-priority customer of a different store than where Mr. Vitagliano worked insisted on speaking to a manager, Mr. Vitagliano, ever the consummate team player, spoke to that client even while she was at a different store and did his best to resolve the dispute.

72.     After speaking with the client, Mr. Vitagliano summarized the situation and handed it off to Ms. Martin.  Ms. Martin would later assure Mr. Vitagliano that he had handled that situation properly.

73.     With regard to the performance of the UWS store, Mr. Vitagliano was instrumental in generating substantial revenues for this historically underperforming store.  In

fact, during July and August 2020, Mr. Vitagliano alone produced almost 80% of that store's revenue.

74.     Notably, due to Mr. Vitagliano's efforts, the UWS store was the only Jonathan Adler store that, despite the global pandemic, surpassed its year-over-year sales for the month of August 2020.  As a result, Mr. Vitagliano qualified for a commission payment of $2,000 that month.

75.     In early September 2020, Mr. Vitagliano had the opportunity to meet with Mr. Sonfield, the Company's CEO, who was not shy about praising Mr. Vitagliano for his performance, particularly in helping turn around the UWS store.

76.     In fact, when Mr. Vitagliano remarked on how he did not want to remain an Assistant Manager for much longer, Mr. Sonfield tellingly replied, "We've been discussing this – for now, keep up the good work."

77.     It was clear that Mr. Vitagliano had already made a strong and positive impression on Mr. Sonfield, and that he had positioned himself for a well-deserved promotion.

78.     Meanwhile, by September 2020, the practice at the Company regarding the timing of when monthly sales commissions were paid to employees was to include the commissions payment with the first paycheck issued in the following month.

79.     However, the Company failed to pay Mr. Vitagliano his August 2020 commission with the first paycheck issued to him in September.

80.     When Mr. Vitagliano inquired about this discrepancy, he was told that the payment was delayed because of the Labor Day holiday, and that he would be paid his commissions with his next paycheck.  However, the Company still failed to pay Mr. Vitagliano his earned commissions with his next paycheck.

81.     On September 25, 2020, Mr. Vitagliano complained to Ms. Martin about the Company's failure to timely pay him his earned commissions.  Ms. Martin, clearly aggravated by Mr. Vitagliano's complaints, took the stance that the Company purportedly could issue commission payments up to three pay periods after the month in which the commissions accrued, and therefore was not failing to timely pay its employees.

82.     The Company also offered to immediately wire Mr. Vitagliano the commissions payout he was owed.  Mr. Vitagliano accepted this offer and received a wire payment later that day.

83.     Four days later, on September 29, 2020, Mr. Vitagliano was abruptly fired over the phone by Ms. Martin.

84.     Mr. Vitagliano was in shock and bewildered by this sudden decision.  When he pressed to know why this decision had been made, no reason was provided other than a vague assertion by Ms. Martin that Mr. Vitagliano was purportedly not the "right fit" for the Company.

85.     Mr. Friedman, who was Mr. Vitagliano's direct manager at the time, was also on the call but was noticeably silent, indicating that the decision to terminate Mr. Vitagliano's employment came as a surprise to him as well.

86.     Mr. Vitagliano never received his commissions for September 2020.

87.     Mr. Vitagliano, who was praised profusely just weeks earlier by Jonathan Adler's CEO for his outstanding performance, and who received nothing but positive feedback from his managers about his interactions with other staff and clients, was a model employee, extraordinary producer, and had a flawless disciplinary record.

88.     No complaints or concerns about Mr. Vitagliano's performance or demeanor were ever brought to Mr. Vitagliano's attention.

89.     What vague, unspecified "different fit" was Jonathan Adler looking for?

90.     Simply put, the Company's explanation for Mr. Vitagliano's termination is pretextual, and the reality is that he was unlawfully fired for engaging in protected activity.

91.     Notably, while Mr. Vitagliano was notified of his termination on September 29, 2020, Jonathan Adler actually discontinued his insurance coverage on September 27, 2020, which was just two days after Mr. Vitagliano complained to Ms. Martin about the Company's failure to pay him his owed commissions.

92.     This gratuitous and non-compliant, vindictive action further strengthens the unmistakable evidence of retaliatory animus by the Company and members of its management.

93.     Notably, Mr. Friedman, in a subsequent conversation with Mr. Vitagliano, confirmed that he was "totally blindsided" by the Company's decision to fire Mr. Vitagliano, or in other words, was not involved in or asked to provide any input into the decision to terminate Mr. Vitagliano's employment.  Mr. Friedman further affirmed to Mr. Vitagliano that he "had no reason" to even want to terminate Mr. Vitagliano's, particularly because Mr. Vitagliano was a "f*cking money machine," a reference to Mr. Vitagliano's strong sales performance and acumen.

94.     Moreover, to add further insult to injury, the Company has maligned Mr. Vitagliano's character and work ethic by telling his former colleagues that he was fired because he supposedly "stopped showing up" to work, a blatantly false statement that paints Mr. Vitagliano in a tremendously negative light and damages his professional reputation.

95.     In conclusion, Mr. Vitagliano seeks all available relief against Jonathan Adler for engaging in unlawful retaliation and for fostering and permitting an environment that allowed him to be repeatedly sexually harassed by his supervisor.

## FIRST CAUSE OF ACTION
**(Sexual Orientation Discrimination and Harassment in Violation of Title VII)**
***Against Defendant Jonathan Adler***

96.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

97.     By the actions described above, Mr. Vitagliano was discriminated against on the basis of his sexual orientation by Jonathan Adler, including, but not limited to, by being sexually harassed by Defendant Buckner, in violation of Title VII.

98.     By the above-described conduct, Jonathan Adler allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

99.     By the above-described conduct, Jonathan Adler tolerated, condoned, ratified and/or engaged in the sexually abusive work environment on account of Mr. Vitagliano's sexual orientation, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

100.     As a direct and proximate result of Jonathan Adler's unlawful actions or inactions, Mr. Vitagliano has suffered, and will continue to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

101.    Jonathan Adler's unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of Title VII, for which Mr. Vitagliano is entitled to an award of punitive damages.

<strong><u>SECOND CAUSE OF ACTION</u></strong><br>
<strong>(Sex Discrimination and Harassment in Violation of Title VII)</strong><br>
<strong><em>Against Defendant Jonathan Adler</em></strong>

102.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

103.    By the actions described above, Mr. Vitagliano was discriminated against on the basis of his sex by Jonathan Adler, including, but not limited to, by being sexually harassed by Defendant Buckner, in violation of Title VII.

104.    By the above-described conduct, Jonathan Adler allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

105.    By the above-described conduct, Jonathan Adler tolerated, condoned, ratified and/or engaged in the sexually abusive work environment on account of Mr. Vitagliano's sex, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

106.    As a direct and proximate result of Jonathan Adler's unlawful actions or inactions, Mr. Vitagliano has suffered, and will continue to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which he is entitled to an award of

damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

107.     Jonathan Adler's unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of Title VII, for which Mr. Vitagliano is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**
*Against Defendant Jonathan Adler*

108.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

109.     By the actions described above, among others, Jonathan Adler retaliated against Mr. Vitagliano in violation of Title VII because he complained about being sexually harassed by Defendant Buckner, including, but not limited to, by transferring him to a lesser performing store, failing to pay him wages he was owed, terminating from his employment, and disparaging him following his firing.

110.     As a direct and proximate result of Jonathan Adler's unlawful retaliatory conduct, Mr. Vitagliano has suffered, and continues to suffer, monetary and/or other economic harm.

111.     As a direct and proximate result of Jonathan Adler's unlawful retaliatory conduct, Mr. Vitagliano has suffered, and continues to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

17

112.    Jonathan Adler's unlawful and retaliatory actions constitute malicious, willful and wanton violations of Title VII, entitling Mr. Vitagliano to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**(Sexual Orientation Discrimination and Harassment in Violation of the NYSHRL)**
***Against All Defendants***

113.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

114.    By the actions described above, among others, Mr. Vitagliano was discriminated against on the basis of his sexual orientation by Defendants, including, but not limited to, by being sexually harassed by Defendant Buckner, in violation of the NYSHRL.

115.    By the above-described conduct, Defendants allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

116.    By the above-described conduct, Defendants tolerated, condoned, ratified and/or engaged in the sexually abusive work environment on account of Mr. Vitagliano's sexual orientation, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

117.    As a direct and proximate result of Defendants' unlawful actions or inactions, Mr. Vitagliano has suffered, and will continue to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

118.    Defendants' unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of the NYSHRL, for which Mr. Vitagliano is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Sex Discrimination and Harassment in Violation of the NYSHRL)
### *Against All Defendants*

119.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

120.    By the actions described above, among others, Mr. Vitagliano was discriminated against on the basis of his sex by Defendants, including, but not limited to, by being sexually harassed by Defendant Buckner, in violation of the NYSHRL.

121.    By the above-described conduct, Defendants allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

122.    By the above-described conduct, Defendants tolerated, condoned, ratified and/or engaged in the sexually abusive work environment on account of Mr. Vitagliano's sex, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

123.    As a direct and proximate result of Defendants' unlawful actions or inactions, Mr. Vitagliano has suffered, and will continue to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic

damages and non-economic damages, for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

124.    Defendants' unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of the NYSHRL, for which Mr. Vitagliano is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
***Against All Defendants***

125.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

126.    By the actions described above, among others, Defendants retaliated against Mr. Vitagliano in violation of the NYSHRL because he complained about being sexually harassed by Defendant Buckner, including, but not limited to, by transferring him to a lesser performing store, failing to pay him wages he was owed, terminating from his employment, and disparaging him following his firing.

127.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Vitagliano has suffered, and continues to suffer, monetary and/or other economic harm.

128.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Vitagliano has suffered, and continues to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

129.    Jonathan Adler's unlawful and retaliatory actions constitute malicious, willful and wanton violations of NYSHRL, entitling Mr. Vitagliano to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Aiding and Abetting Violation of the NYSHRL)**
*Against Defendants Chris Buckner and Linet Martin*

130.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

131.    Defendants Chris Buckner and Linet Martin knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Mr. Vitagliano was subjected in violation of the NYSHRL.

132.    As a direct and proximate result of Defendants Chris Buckner and Linet Martin's unlawful aiding and abetting in violation of NYSHRL, Mr. Vitagliano has suffered and continues to suffer harm for which he is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

133.    Defendants Chris Buckner and Linet Martin's unlawful aiding and abetting constitutes malicious, willful, wanton, and reckless violations of the NYSHRL for which Mr. Vitagliano is entitled to an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
**(Sexual Orientation Discrimination and Harassment in Violation of the NYCHRL)**
*Against All Defendants*

134.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

135.    By the actions described above, among others, Mr. Vitagliano was discriminated against on the basis of his sexual orientation by Defendants, including, but not limited to, by being sexual harassed by Defendant Buckner, in violation of the NYCHRL.

136.     By the above-described conduct, Defendants allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

137.     By the above-described conduct, Defendants tolerated, condoned, ratified and/or engaged in the sexually abusive work environment on account of Mr. Vitagliano's sexual orientation, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

138.     As a direct and proximate result of Defendants' unlawful actions or inactions, Mr. Vitagliano has suffered, and will continue to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

139.     Defendants' unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of the NYCHRL, for which Mr. Vitagliano is entitled to an award of punitive damages.

## NINTH CAUSE OF ACTION
### (Sex Discrimination and Harassment in Violation of the NYCHRL)
#### *Against All Defendants*

140.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

141.    By the actions described above, among others, Mr. Vitagliano was discriminated against on the basis of his sex by Defendants, including, but not limited to, by being sexual harassed by Defendant Buckner, in violation of the NYCHRL.

142.    By the above-described conduct, Defendants allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

143.    By the above-described conduct, Defendants tolerated, condoned, ratified and/or engaged in the sexually abusive work environment on account of Mr. Vitagliano's sex, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

144.    As a direct and proximate result of Defendants' unlawful actions or inactions, Mr. Vitagliano has suffered, and will continue to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

145.    Defendants' unlawful actions constitute knowing, malicious, willful, wanton and reckless violations of the NYCHRL, for which Mr. Vitagliano is entitled to an award of punitive damages.

## TENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

146.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

147.    By the actions described above, among others, Defendants retaliated against Mr. Vitagliano in violation of the NYCHRL because he complained about being sexually harassed by Defendant Buckner, including, but not limited to, by transferring him to a lesser performing store, failing to pay him wages he was owed, terminating from his employment, and disparaging him following his firing.

148.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Vitagliano has suffered, and continues to suffer, monetary and/or other economic harm.

149.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Vitagliano has suffered, and continues to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

150.    Jonathan Adler's unlawful and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL, entitling Mr. Vitagliano to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
### (Aiding and Abetting Violation of the NYCHRL)
### *Chris Buckner and Linet Martin*

151.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

152.     Defendants Chris Buckner and Linet Martin knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Mr. Vitagliano was subjected in violation of the NYCHRL.

153.     As a direct and proximate result of Defendants Chris Buckner and Linet Martin's unlawful aiding and abetting in violation of NYCHRL, Mr. Vitagliano has suffered and continues to suffer harm for which he is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

154.     Defendants Chris Buckner and Linet Martin's unlawful aiding and abetting constitutes malicious, willful, wanton, and reckless violations of the NYCHRL for which Mr. Vitagliano is entitled to an award of punitive damages.

## TWELFTH CAUSE OF ACTION
### (Violation of NYLL)
### *Against Defendant Jonathan Adler*

155.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

156.     Pursuant to New York Labor Law § 190(6), a "'commission salesman' means any employee whose principal activity is the selling of any goods, wares, merchandise, services. . . or any article or thing and whose earnings are based in whole or in part on commissions."

157.     Pursuant to New York Labor Law § 191(1)(c), "[a] commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment."

158.     As described above, Jonathan Adler has failed to pay Plaintiff all promised wages and commissions that he has earned and was owed.  As a result, Jonathan Adler has violated NYLL § 191.

159.     Jonathan Adler's violations of the NYLL were willful.

160.     Due to Jonathan Adler's violations of the NYLL, Mr. Vitagliano is entitled to recover his unpaid promised wages and commissions in an amount to be determined at trial, plus pre-judgment interest, liquidated damages, attorneys' fees, costs and other damages recoverable under the NYLL.

## THIRTEENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYLL § 215)
### *Against All Defendants*

161.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

162.     By the actions described above, among others, Defendants retaliated against Mr. Vitagliano in violation of the NYLL because he complained about not being paid his wages and/or commissions on time, including, but not limited to, terminating from his employment, and disparaging him following his firing.

163.     As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Vitagliano has suffered, and continues to suffer, monetary and/or other economic harm.

164.     As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Vitagliano has suffered, and continues to suffer, harm, including, but not limited to, loss of future

employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

165.    Jonathan Adler's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYLL, entitling Mr. Vitagliano to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Vitagliano prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State and City of New York and the United States of America;

B.    An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his emotional distress;

E.    An award of punitive damages, in an amount to be determined at trial;

F.    Liquidated damages;

G.    Prejudgment interest on all amounts due;

H.     An award of Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure Rule 38(b), Plaintiff demands a trial by jury in this action.

Dated: June 13, 2021
       New York, New York                        Respectfully submitted,

                                                 **WIGDOR LLP**

                                                 By: _____
                                                     Lawrence M. Pearson
                                                     Tanvir H. Rahman

                                                 85 Fifth Avenue
                                                 New York, NY 10003
                                                 Telephone: (212) 257-6800
                                                 Facsimile: (212) 257-6845
                                                 lpearson@wigdorlaw.com
                                                 trahman@wigdorlaw.com

                                                 *Attorneys for Plaintiff*